1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 | KELLY BEAU DAVIS,

Case No.  1:20-cv-00276-KES-HBK (PC)

12 |     Plaintiff,

FINDINGS AND RECOMMENDATION TO
GRANT DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

13 | v.

14

15 | KHUONG PHUI and G. UGWUEZE,

(Doc. No. 84)

16 |     Defendants.

FOURTEEN-DAY OBJECTION PERIOD

17

18

19

20        Pending before the Court is Defendants Khuong Phui and G. Ugwueze's motion for

21 summary judgment filed May 14, 2024.  (Doc. No. 84).  Plaintiff filed an Opposition on July 22,

22 2024 and Defendants filed a Reply on July 30, 2024.  (Doc. Nos. 90, 91).  As directed,

23 Defendants subsequently filed a Statement of Undisputed Facts (Doc. No. 93), and Plaintiff filed

24 a response to Defendants' Statement of Undisputed Facts (Doc. No. 96).  Plaintiff also filed his

25 own separate Statement of Undisputed Facts.  (Doc. No. 94).  For the reasons discussed below,

26 the undersigned recommends the district court grant Defendants' motion for summary judgment

27 because there is no genuine dispute of material fact as to whether Defendants acted with

28 deliberate indifference to Plaintiff's serious medical condition.

1

## I.      BACKGROUND

2

### A.  Procedural History

3      Plaintiff Kelly Beau Davis, who is a state prisoner and represented by private counsel in

4  this civil rights action, is proceeding on his Second Amended Complaint under 42 U.S.C. § 1983,

5  as screened.  (Doc. No. 54, "SAC").  On November 26, 2024, the District Court granted

6  Defendants Chanza, Cryer, and Sherman's exhaustion-based motion for summary judgment and

7  dismissed those Defendants.  (Doc. No. 97).  The undersigned now turns to the two remaining

8  defendants' dispositive motion, Defendants Phui and Ugwueze's merits-based motion for

9  summary judgment.  (Doc. No. 84, "MSJ").

10     ### B.  Defendants' MSJ

11     Supporting their MSJ, Defendants submit: (1) a memorandum of points and authorities

12  (Doc. No. 84); (2) the declaration of Defendant Khuong Phui (Doc No. 84-1); (3) Plaintiff's

13  Medical Records (Doc. No. 84-2); (4) the declaration of Defendant G. Ugwueze, (Doc. No. 84-3);

14  (5) the declaration of CDCR Custodian of Records J. Garcia Authenticating Exhibit A (Doc. No.

15  84-4); (6) Exhibit A, a log of Plaintiff's transfers within SATF, to other CDCR facilities, and to

16  outside hospitals;  (Doc. No. 84-5); (7) the expert report of Dr. Harry Lampiris (Doc. No. 84-6);

17  and (8) a Statement of Undisputed Material Facts (Doc. No. 93).

18     ### C.  Plaintiff's Opposition to Defendants' MSJ

19      In Opposition, Plaintiff submits: (1) a Memorandum of Points and Authorities (Doc. No.

20  90); (2) exhibits including (i) Plaintiff's medical records, (ii) a January 29, 2019 email from

21  Plaintiff's wife to Dr. Phui, and (iii) a publication from the Centers for Disease Control and

22  Prevention describing the Duke Criteria for Infective Endocarditis; (3) a Statement of Undisputed

23  Facts (Doc. No. 94); and (4) a Response to Defendants' Statement of Undisputed Facts (Doc. No.

24  96).

25     ## II.  APPLICABLE LAW

26     ### A.  Summary Judgment Standard

27      The "purpose of summary judgment is to pierce the pleadings and to assess the proof in

28  order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith*

2

1   *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate

2   when there is "no genuine dispute as to any material fact and the movant is entitled to judgment

3   as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be entered "after adequate

4   time for discovery and upon motion, against a party who fails to make a showing sufficient to

5   establish the existence of an element essential to that party's case, and on which that party will

6   bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The

7   moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of

8   material fact.  *Id.* at 323.  An issue of material fact is genuine only if there is sufficient evidence

9   for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might

10  affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477

11  U.S. 242, 248 (1986).

12      If the moving party meets its initial burden, the burden then shifts to the opposing party

13  to present specific facts that show there to be a genuine issue of a material fact.  *See* Fed R. Civ.

14  P. 56(e); *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that

15  there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 587.  The

16  party is required to tender evidence of specific facts in the form of affidavits, and/or admissible

17  discovery material, in support of its contention that a factual dispute exists.  Fed. R. Civ. P.

18  56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party is not required to establish a

19  material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be

20  shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

21  *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.

22  1987).  However, "failure of proof concerning an essential element of the nonmoving party's

23  case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

24      The court must apply standards consistent with Rule 56 to determine whether the

25  moving party demonstrated there is no genuine issue of material fact and showed judgment to be

26  appropriate as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

27  "[A] court ruling on a motion for summary judgment may not engage in credibility

28  determinations or the weighing of evidence."  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir.

3

2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 772 (9th Cir. 2002).  A mere scintilla of evidence is not sufficient to establish a genuine dispute to defeat an otherwise properly supported summary judgment motion.  *Anderson*, 477 U.S. at 252.  However, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record" courts "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff's verified complaint may serve as an affidavit in opposition to summary judgment if based on personal knowledge and specific facts admissible in evidence.  *Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc).  However, a complaint's conclusory allegations unsupported by specific facts, will not be sufficient to avoid summary judgment.  *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 (9th Cir. 2001).  And, where a plaintiff fails to properly challenge the facts asserted by the defendant, the plaintiff may be deemed to have admitted the validity of those facts.  *See* Fed. R. Civ. P. 56(e)(2).

The undersigned has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties.  The omission to an argument, document, paper, or objection is not to be construed that the undersigned did not consider the argument, document, paper, or objection.  Instead, the undersigned thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate for purposes of issuing these Findings and Recommendations.

### B.  Eighth Amendment Medical Deliberate Indifference

The Constitution requires prison officials to provide inmates with reasonably adequate medical care.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  To hold an official liable for violating this duty under the Eighth Amendment, the inmate must satisfy two prongs, an objective prong and subjective prong.  First, the inmate must suffer from a serious medical need (the objective prong); and second the official must be deliberately indifferent to the inmate's serious medical

4

need (the subjective prong).  *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1082-83 (9th Cir. 2014); *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012).  A medical need is "serious" if the failure to treat "could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).  The "second prong—defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id*. (internal citations omitted).  This standard requires that the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002).  This "subjective approach" focuses only "on what a defendant's mental attitude actually was." *Farmer*, 511 U.S. at 839.

Deliberate indifference is a higher standard than medical negligence or malpractice, and a difference of opinion between medical professionals—or between a physician and the prisoner—generally does not amount to deliberate indifference.  *See generally Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (A mere "difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference.").  To prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson*, 90 F.3d at 332.

Neither will an "inadvertent failure to provide medical care" sustain a claim.  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  Misdiagnosis alone is not a basis for a claim, *see Wilhelm*, 680 F.3d at 1123, and a "mere delay" in treatment, "without more, is insufficient to state a claim of deliberate medical indifference," *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404,

407 (9th Cir. 1985).  Instead, a prisoner must show that a delay "would cause significant harm and that defendants should have known this to be the case."  *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002).

### C.  Supervisory Liability

To state a claim under § 1983, a plaintiff must show that a defendant acting under color of state law caused an alleged deprivation of a right secured by federal law.  *See* 42 U.S.C. § 1983; *Park v. Thompson*, 851 F.3d 910, 921 (9th Cir. 2017).  The plaintiff can satisfy the causation requirement by showing either (1) the defendant's "personal involvement" in the alleged deprivation or (2) a "sufficient causal connection" between the defendant's conduct as a supervisor and the alleged deprivation.  *King v. Cty. of Los Angeles*, 885 F.3d 548, 559 (9th Cir. 2018).  "There is no respondeat superior liability under section 1983."  *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989) (citations omitted).  A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations or knew of the violations and failed to act to prevent them.  *Id*., *see also Starr v. Baca,* 652 F.3d 1202, 1206–07 (9th Cir. 2011).

### III.  ANALYSIS

### A.  Allegations in Plaintiff's Operative Complaint

The following factual allegations are set forth in Plaintiff's SAC.  As a child, Plaintiff was diagnosed with a heart murmur, which requires that he receive antibiotics in advance of any dental procedure.  (Doc. No. 54 at 6 ¶ 14).  While incarcerated at California Substance Abuse Treatment Facility ("SATF"), Plaintiff suffered complications after dentists failed to provide him antibiotics while treating him for a tooth abscess.  (*See id*. at 6-9).

Plaintiff sought treatment from the medical staff at SATF after he became severely ill with symptoms including "fever, chills, tiredness, and weight loss."  (*Id*. at 7 ¶ 20).  The SAC alleges that Defendant Phui ignored Plaintiff's stated symptoms and attributed Plaintiff's illness to drug use.  (*Id*.).  Over the next four months, Plaintiff continued to suffer pain, fever, chills, tiredness and lost nearly 50 pounds.  (*Id*. ¶ 21).  The SAC alleges that Defendant Ugwueze, SATF's Chief Medical Officer, conspired with another SATF doctor to place Plaintiff in a non-existent drug

1   treatment program "to cover up for denial of adequate medical care and switch focus to drug

2   abuser in order to obtain further, additional Federal Funding." (*Id*. at 8 ¶ 24). Ultimately, on

3   January 30, 2019, Defendant Phui ordered Plaintiff transferred to Adventist Bakersfield Hospital

4   on an emergency basis, where "it was immediately found that Davis had heart malfunction(s) due

5   to an untreated mouth infection from the abscessed tooth and extraction of October 15, 2018."

6   (*Id*. at 7 ¶¶ 21-22). Plaintiff ultimately underwent multiple heart surgeries to repair the damage

7   caused by the infections. (*Id*. at 7-8). As a result of Defendants' inadequate medical care,

8   Plaintiff "sustained severe damage . . . to his heart, multiple heart surgeries, severe pain and

9   lifelong damage; loss of his ability to engage in future occupation(s) to support himself and/or his

10  family; [and] inability to pay for future required lifelong medical expenses . . ." (*Id*. at 9 ¶ 33).

11  **B. Defendants' Proposed Expert Testimony**

12  Defendants offer Dr. Lampiris's opinion testimony as expert testimony and seek to qualify

13  him as an expert based on his education, background, training, knowledge, and experience,

14  coupled with his review of Plaintiff's medical records.[1] (Doc. No. 84-6 at 1). Fed. R. Evid. 702

15  requires that expert testimony be both "reliable and relevant" whether based on scientific,

16  technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

17  149 (1999).

18  Dr. Lampiris, M.D., received his medical degree from the University of California, San

19  Francisco (UCSF) in 1985 and has been a licensed physician in California since 1989. (Doc. No.

20  84-6 at 5). Lampiris is certified in both Internal Medicine and Infectious Diseases with the

21  American Board of Internal Medicine. (*Id*.). He was a professor of medicine at UCSF for 30

22  years (now emeritus) and served as the Chief, Infectious Disease Section, at the San Francisco

23

---

24  [1] Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:
    A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify

25  if the form of an opinion or otherwise if:
          (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

26    understand the evidence or to determine a fact in issue;
          (b) the testimony is based upon sufficient facts or data;

27        (c) the testimony is the product of reliable principles and methods; and
          (d) the witness has reliably applied the principles and methods to the facts of the case.

28  Fed. R. Evid. 702.

1  Veterans Administration Medical Center for 14 years.  (*Id.* at 5-6).  In formulating his opinions,

2  Dr. Lampiris reviewed Plaintiff's pertinent medical records from October 2018 to February 2019,

3  including his treatment at CSATF and Adventist Bakersfield Hospital.  (*Id.* at 2).

4       In pertinent part, Dr. Lampiris states "it is common for the correct diagnosis of

5  enterococcal endocarditis to be delayed, because the symptoms are very vague and often

6  attributed to other more common causes."  (Doc. No. 84-6 at 3).  In support, Dr. Lampiris points

7  to the "a review article on this subject (A Dahl and NE Brunn, 2013; Enterococcus faecalis

8  infective endocarditis: focus on clinical aspects. Expert Rev Cardiovasc Ther 11:1247 – 57)"

9  noting "[i]t takes an average of 6 weeks to diagnose enterococcal endocarditis because the

10  symptoms are very vague and it is not uncommon for patients to have symptoms for up to 3

11  months with this infection, which leads to slow destruction of heart valves requiring valve

12  replacement in approximately 40% of patients."   (*Id.*).  In conclusion, Dr. Lampiris opines as

13         to the question of whether there was "deliberate indifference" or the
   reckless delay in time to the patient receiving appropriate medical

14         care, I believe there is much evidence that this was not the case for
   this patient. His urinary tract infection was treated expeditiously in

15         early October 2018 and there was a documented follow-up visit
   showing improvement in the patient's symptoms. Between the end

16         of November 2018 and January 2019, the patient was seen in the
   outpatient setting at least 10 times by his primary provider and

17         subsequently by the appropriate medical specialists. The patient had
   extensive diagnostic testing and treatment for causes of recurrent

18         pneumonia, leading to partial improvement in his symptoms with
   each course of antibiotics that he received. This is common in cases

19         of subacute enterococcal endocarditis, but these short courses of
   antibiotics are never effective in treating the infection completely,

20         and the infection almost always recurs. Thus, despite the attempts
   by this person's medical team to come up with an effective

21         treatment plan based upon thorough and multiple medical visits, the
   diagnosis was not considered until approximately 10 weeks after

22         the onset of the patient's symptoms, a not uncommon delay in cases
   of enterococcal endocarditis. When the patient's correct diagnosis

23         was made, he made an expected full recovery with surgical
   replacement of his aortic valve and a prolonged course of

24         intravenous antibiotics targeted to treat the enterococcal
   endocarditis.

25

26  (Doc. No. 84-6 at 4).  The Court accepts Dr. Lampiris' opinion as expert testimony under Federal

27  Rules of Evidence 702 as to the medical care rendered by Defendants to Plaintiff, to the extent

28  relevant.

**C. Undisputed Material Facts**

Defendants and Plaintiff each provide a statement of Undisputed Material Facts.  (Doc. Nos. 93, 94).  Each listed fact cites to the operative supporting document and is gleaned from sworn declarations, Plaintiff's medical records, and the Second Amended Complaint.  (*See generally id*).  Having reviewed the record, the undersigned finds the following facts to be material and undisputed, unless otherwise noted.

- Plaintiff Kelly Davis is a California Department of Corrections and Rehabilitation prisoner who was incarcerated at the Substance Abuse Treatment Facility ("SATF") when the alleged events involving Defendants Dr. K. Phui and Dr. G. Ugwueze occurred. (Doc. No. 54 at 2).

- Dr. Phui was employed at SATF as a physician and Dr. Ugwueze was the Chief Medical Executive at SATF.  (Doc. No. 84-1 ¶ 1; Doc. No. 84-3 ¶ 1).

- In September 2018, Davis met with a SATF nurse practitioner for back pain and hepatitis C treatment.  (Doc. No. 84-1, Doc. No. 84-5 at 2-3).

- In October 2018, Davis met with the nurse practitioner again, claiming he previously had blood in his semen but the issue had resolved with antibiotic treatment.  Davis was assessed with inflammation of his prostate and the nurse practitioner ordered routine lab work.  (Doc. No. 84-1, Doc. No. 84-5 at 1-2).

- On November 28, 2018, Dr. Phui met with Davis.  Davis complained of coughing, night sweats, shivers, muscle aches, bone pain, fatigue, loss of appetite, weight loss, and a nodule on his lower right extremity.  Davis denied nausea, vomiting, or coughing up blood, and explained he previously had similar symptoms a month ago, which were successfully treated with antibiotics.  (Doc. No. 84-1 ¶ 5; Doc. No. 84-2 at 1).

- Dr. Phui conducted a chest x-ray, which revealed bilateral interstitial infiltrates, suggestive of an atypical infection.  (Doc. No. 84-1 ¶ 5; Doc. No. 84-2 at 1).

- Based on his experience and Davis's reported symptoms, Dr. Phui suspected pneumonia caused by coccidiodomycosis, a fungal infection colloquially known

9

as Valley Fever or "cocci."  SATF is in Corcoran, an endemic region for Valley Fever.  (Doc. No. 84-1 ¶ 5).

- Dr. Phui prescribed antibiotics and antifungals to treat Valley Fever and ordered lab testing, including a diagnostic test for Valley Fever.  (Doc. No. 84-1 ¶ 5; Doc. No. 84-2 at 1).

- On December 5, 2018, a week later, Dr. Phui met with Davis for a follow-up appointment.  Davis continued to report similar symptoms and reported doubling up on his antifungal prescription after feeling shortness of breath in connection with his coughing and fever, which appeared to alleviate those symptoms.  Davis stated the nodule on his lower right extremity had resolved but that he developed another nodule on his left foot.  (Doc. No. 84-1 ¶ 6; Doc. No. 84-2 at 4).

- Dr. Phui noted that Davis's Valley Fever test results were still pending but that his other lab test results appeared normal.  (Doc. No. 84-1 ¶ 6; Doc. No. 84-2 at 4).

- Dr. Phui switched Davis to a different antibiotic and ordered further testing and x-rays.  (Doc. No. 84-1 ¶ 6; Doc. No. 84-2 at 4-5).

- On December 7, 2018, Dr. Phui again met with Davis to follow up on his additional test and x-ray results.  (Doc. No. 84-1 ¶ 7; Doc. No. 84-2 at 6).

- Defendants assert that Davis's additional x-ray showed similar results as his first x-ray, while his lab test results remained normal.  (*Id.*).  Plaintiff disputes this statement because the second x-ray showed an enlarged heart and there are no facts in the record as to whether the first x-ray also showed an enlarged heart.  (Doc. No. 96 at 5 ¶ 14; Doc. No. 90 at 9).

- During the December 7 meeting, Davis explained he generally felt fine during the day, but experienced shortness of breath when lying down.  Davis also reported coughing up blood, but denied having any fevers over the last couple of days.  (*Id.*).

- Because Davis's Valley Fever test results were still pending, Dr. Phui continued Davis's antifungal and antibiotic prescriptions, but prescribed Davis an inhaler and

10

cough medicine to address his cough with instructions to use them as necessary. (Doc. No. 84-1 ¶ 7; Doc. No. 84-2 at 12-13).

- On December 11, 2018, Dr. Phui met with Davis for a follow-up examination. Davis's Valley Fever results returned negative. (Doc. No. 84-1 ¶ 8; Doc. No. 84-2 at 14).

- Dr. Phui re-ordered the diagnostic test based on his experience that the Valley Fever test can sometimes return false negatives and because Davis's symptoms were consistent with Valley Fever.  Dr. Phui nonetheless also referred Davis to an infectious disease specialist for a consultation.  (Doc. No. 84-1 ¶ 8; Doc. No. 84-2 at 14-15).

- During the examination, Dr. Phui detected a heart murmur, but Davis explained he had a history of heart murmurs that his physicians would only occasionally detect. Davis reported feeling a bit better overall and stated his nodules had improved.  Dr. Phui continued Davis's prescriptions with instructions to notify staff if his symptoms worsened.  (Doc. No. 84-1 ¶ 8; Doc. No. 84-2 at 14-15).

- On December 17, 2018, a physician's assistant met with Davis for a follow-up examination for his pneumonia.  Davis continued to report symptoms while lying down, but his weakness was going away and his nodules had resolved.  Davis reported some weight loss, but also stated he had begun working out.  His tests for Valley Fever and tuberculosis remained negative, and his white blood cell count remained normal.  His lab test results remained within normal ranges, and the physician assistant did not detect a heart murmur.  The physician assistant continued Davis's prescriptions and ordered additional chest x-rays and HIV testing.  (Doc. No. 84-1 ¶ 9; Doc. No. 84-2 at 16-17).

- On December 24, 2018, Davis again met with other medical staff for his cough and pneumonia.  The nurse practitioner started Davis on a five-day course of Levaquin (an antibiotic) and scheduled him for a follow-up examination in two days.  (Doc. No. 84-1 ¶ 10; Doc. No. 84-2 at 18).

11

- On December 26, 2018, Dr. Phui met with Davis for a follow-up appointment. Davis denied having a fever and stated his coughing had decreased, but that he was still coughing up blood. Dr. Phui recommended Davis avoid exercising until his symptoms were completely improved based on his assessment that Davis's health appeared to be improving until he started exercising. Dr. Phui continued Davis's prescriptions and scheduled a follow-up appointment in one week, after his pending lab tests and chest x-ray results were completed. (Doc. No. 84-1 ¶ 11; Doc. No. 84-2 at 19).

- On January 2, 2019, Dr. Phui met with Davis for his scheduled follow-up. Davis reported regaining weight, stated he felt better after taking Levaquin, but began to have symptoms again after completing his course of Levaquin. He also stated he was no longer coughing up blood and continued denying any fevers. Davis tested negative for Valley Fever, HIV, and tuberculosis. His lab tests remained normal except for his c-reactive protein test, which was elevated. Davis's chest x-ray showed that his lungs were enlarged. Given that Davis was scheduled for an infectious disease referral the next week, Dr. Phui continued Davis's fluconazole prescription, started him on doxycycline (an antibiotic), and ordered a sputum/lower respiratory culture. (Doc. No. 84-1 ¶ 12; Doc. No. 84-2 at 21-22).

- On January 8, 2019, Davis met with an infectious disease specialist. The specialist noted Davis's significantly elevated CRP test results and thrombocytosis, a disorder in which the body produces too many platelets, which suggested an infection. Davis's test results were otherwise "unremarkable." The specialist concluded that Davis likely had an infection but could not be certain as to the specific diagnosis. The specialist recommended various tests, including a CT scan, blood tests for Q fever and histoplasma, and urine tests for gonorrhea and chlamydia. The specialist also recommended an infectious diseases follow-up within the next three to four weeks. (Doc. No. 84-1 ¶ 10; Doc. No. 84-2 at 23-25).

- On January 11, 2019, Dr. Phui met with Davis for a follow-up appointment

12

following the results of his infectious disease referral.  Dr. Phui started Davis on Bactrim as some of his symptoms had previously improved while on that antibiotic.  Dr. Phui also ordered the diagnostic tests recommended by the infectious disease specialist, scheduled a follow-up with the infectious disease specialist, and requested additional referrals with urology and pulmonology specialists.  (Doc. No. 84-1 ¶ 14; Doc. No. 84-2 at 27-28).

- On January 22, 2019, Dr. Phui met with Davis for a follow-up appointment.  Davis stated he felt great while taking the Bactrim but started feeling chills and muscle aches after completing the antibiotic course.  Davis denied having coughs, fevers, coughing up blood, shortness of breath, or night sweats.  He also stated he no longer saw blood in his sperm.  Dr. Phui ordered high-calorie liquid nutrition supplements due to Davis's weight loss, as well as ibuprofen to address his muscle aches.  (Doc. No. 84-1 ¶ 15; Doc. No. 84-2 at 36-37).

- On January 23, 2019, Davis met with the pulmonology specialist.  The specialist noted Davis's lung enlargement as shown on his chest x-rays.  Because Davis's chest CTs were pending, the specialist recommended full pulmonary function testing and to discontinue his fluconazole and antibiotic treatments while awaiting the CT results with a pulmonology follow-up in two months.  (Doc. No. 84-1 ¶ 15; Doc. No. 84-2 at 40-44).

- On January 25, 2019, Dr. Phui met with Davis for a follow-up appointment after his pulmonology referral.  Davis reported chills, night sweats, and fever with pain in his extremities and right leg.  He stated that his symptoms were intermittent, typically lasting three to four days before improving.  Davis denied coughing or shortness of breath.  Dr. Phui ordered various diagnostic and lab tests, a referral to hematology/oncology specialist, and discontinued fluconazole as recommended by the pulmonology specialist. (Doc. No. 84-1 ¶ 17; Doc. No. 84-2 at 34-35).

- On January 29, 2019, Dr. Phui met with Davis for a follow-up appointment.  Davis reported coughing, fatigue, shortness of breath, and felt as though his lung was

"filling up" with popping noises when lying down.  He also reported occasional chills, palpitations, and lesions on his leg and foot.  Davis denied having fever, night sweats, or coughing up blood.  Because Davis was scheduled for the chest CT the next day, Dr. Phui ordered a thyroid function test while awaiting the CT scan. (Doc. No. 84-1 ¶ 18; Doc. No. 84-2 at 32-33).

- On January 30, 2019, Dr. Phui met with Davis following the results of his CT scan. The scan showed bilateral pleural effusion with mild interstitial thickening, as well as moderate right-side pleural effusion, *i.e.*, the accumulation of fluid in his chest. These results suggested endocarditis.  (Doc. No. 84-1 ¶ 19; Doc. No. 84-2 at 30-31).

- Dr. Phui conferred with Dr. Ugwueze, referred Davis to a higher level of care, and transferred Davis to an outside hospital that day.  (Doc. No. 84-1 ¶ 19; *see also* Doc. No. 84-3 at 2 ¶ 5).

- On January 30, 2019, Davis was admitted to an outside hospital, where he was seen by hospital doctors for sepsis.  (Doc. No. 84-1 ¶ 20; Doc. No. 84-2 at 159).

- The hospital doctors recorded Davis's medical history, including his admission to regular IV drug use with his last use on the day of his admission to the hospital. (Doc. No. 84-2 at 148).

- Blood cultures and a CT scan revealed enterococcus bacteria in Davis's blood and he was diagnosed with acute infective endocarditis.  The doctors treated Davis's endocarditis with antibiotics and recommended aortic valve replacement surgery to repair the damage done by the infection.  (Doc. No. 84-2 at 169).

- After more than a week of antibiotic treatment, Davis underwent surgery to replace his aortic valve.  The surgery was successful, and Davis remained in the hospital for a few days for post-surgery recovery.  (Doc. No. 84-2 at 49-50, 144-47, 156-61).

- On February 15, 2019, Davis was discharged back to SATF.  (Doc. No. 84-2 at 55-56).

14

- Davis's hospital doctor recommended further treatment with IV antibiotics for another four weeks, an anticoagulant, and a blood thinner with instructions to gradually reduce its dosage over time. The doctor also recommended physical therapy, regular testing, an infectious disease referral in three weeks, and a cardiothoracic referral in two to three weeks. (Doc. No. 84-2 at 55, 88-89).

- On February 16, 2019, Dr. Phui met with Davis to conduct his readmission history and physical examination. Davis reported feeling better with no complaints of fever, chills, or shortness of breath. Dr. Phui noted the hospital's recommendations for a follow-up with infectious disease and cardiothoracic specialists in two to three weeks, continued treatment with ampicillin (an antibiotic), Coumadin (a blood thinner), Lovenox (an anticoagulant), and physical therapy. Dr. Phui also noted the hospital's recommendation for daily prothrombin time and international normalized ratio tests (to measure blood clotting) with weekly blood tests to check for inflammation and infection. Dr. Phui ordered each referral, treatment, and test recommended by the hospital, in addition to medication for constipation on an as-needed basis and a referral to SATF's medication-assisted treatment program for drug abuse. Dr. Phui did not meet with Davis again until April 1, 2019. (Doc. No. 84-1 at 6-7 ¶¶ 21-22; Doc. No. 84-2 at 172-74).

- Between February 16 and April 1, 2019, Davis received regular treatment and medical care by other SATF doctors and medical staff. (Doc. No. 84-3 at 2 ¶ 7).

- Davis also met with a cardiologist and infectious disease specialist during that time. (Doc. No. 84-1 at 7 ¶ 22).

- On April 1, 2019, Dr. Phui met with Davis. Davis reported doing well, exercising in his cell, and did not have any complaints of fever, chest pain, palpitations, shortness of breath, dyspnea on exertion, or weight loss, suggesting he was in a stable condition without medical issue. Davis's blood test results were also within expected ranges given his prescriptions for blood thinners and other post-surgery medication. Dr. Phui noted Davis's scheduled follow-up appointments with

specialists and continued the prescribed medication.  (Doc. No. 84-1 at 7 ¶ 22; Doc. No. 84-2 at 185-86).

- On May 7, 2019, Dr. Phui saw Davis for a follow-up examination.  Davis continued to report doing well and did not report any chest pain, shortness of breath, or palpitations.  Davis's dose for his blood thinner medication was being tapered and Dr. Phui ordered the regular blood test as recommended by the hospital.  (Doc. No. 84-1 ¶ 23; Doc. No. 84-2 at 180-81).

- On May 17, 2019, Dr. Phui saw Davis to follow-up on his blood test results.  Davis's clotting time test results appeared low, so Dr. Phui stopped the taper of Davis's blood thinner medication and increased its dosage.  Davis complained of congestion, feeling hot, and chills over the past two days.  He denied any coughing, fatigue, night sweats, weight loss, or skin lesions.  Dr. Phui referred Davis to SATF's drug abuse treatment program, but Davis refused the referral. Dr. Phui also ordered antibiotics, blood cultures, and chest x-rays.  (Doc. No. 84-1 ¶ 24; Doc. No. 84-2 at 178-80).

- On May 20, 2019, Davis's blood cultures returned positive for Serratia marcescens bacteria.  A nurse practitioner consulted with a non-party physician and infectious disease specialist, all of whom agreed that Davis should be transferred to an outside hospital.  (Doc. No. 84-2 at 182).

- Davis was transferred to an outside hospital that day.  (Doc. No. 84-2 at 182; Doc. No. 84-4, Doc. No. 84-5 at 7).

- Over the next few months, Davis was regularly admitted to multiple outside hospitals and was briefly transferred to Centinela State Prison to facilitate his medical treatment.  Davis was transferred back to SATF in December 2019.  (Doc. No. 84-4, Doc. No. 84-5 at 1-2).

- On December 10, 2019, Dr. Phui met with Davis.  Davis did not report any chest pain, palpitations, shortness of breath, or other symptoms at that examination.  Davis admitted to regular, daily heroin use with his most recent use the previous

16

day and past intravenous heroin use.  Dr. Phui ordered follow-up examinations with Davis's infectious disease and cardiology specialists in addition to the various recommended blood tests they recommended.  Dr. Phui also again referred Davis to the medication-assisted treatment program for substance abuse.  (Doc. No. 84-1 ¶ 26; Doc. No. 84-2 at 1).

- Dr. Phui did not see Davis again following the December 10, 2019 meeting.  (Doc. No. 84-1 ¶ 27).

- As the Chief Medical Executive, Dr. Ugwueze did not provide primary care for Davis and only served in a supervisory role.  (Doc. No. 84-3 ¶¶ 4, 6).

- Dr. Ugwueze asserts he did not observe any inappropriate or deficient medical care warranting his intervention.  (Doc. No. 84-3 ¶ 7).  Plaintiff disputes this statement, contending that Defendant Phui and CSATF medical staff's failure to diagnose Plaintiff's endocartitis at an earlier time raises a factual dispute as to whether Dr. Ugwueze "may have observed deficient medical care without recognizing it."  (Doc. No. 96 at 16 ¶ 91).

- According to Defendants' medical expert it was reasonable not to suspect endocarditis prior to January 30, 2019 because Davis's symptoms were vague, attributable to more common causes, and the prior courses of antibiotics likely masked the endocarditis by temporarily relieving Davis's symptoms.  (Doc. No. 84-6 at 2-3).

**D.  The Undisputed Facts Show Neither Defendant Acted with Deliberate Indifference to Plaintiff's Serious Medical Condition**

The undersigned first must consider whether Defendants, as the moving parties, have met their initial burden of showing *prima facie* entitlement to summary judgment on the issue of Plaintiff's medical deliberate indifference claim.  *Celotex Corp.*, 477 U.S at 323.  The *prima facie* elements of medical deliberate indifference are (1) a "serious medical need[,] [where] failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain" and (2) the defendant's "response to the need was deliberately

17

1   indifferent." *Wilhelm*, 680 F.3d at 1122 (internal quotation marks and citation omitted).  The

2   second prong is satisfied by showing "(a) a purposeful act or failure to respond to a prisoner's

3   pain or possible medical need and (b) harm caused by the indifference."  *Jett*, 439 F.3d at 1096

4   (internal citations omitted).

5                     **1.  Plaintiff Had a Serious Medical Need**

6          Here, Defendants do not dispute that Davis suffered from a serious medical condition, i.e.

7   infective endocarditis.  Although the undisputed facts establish that Defendants Phui and

8   Ugwueze were not aware that Davis was suffering from endocarditis until January 30, 2019, the

9   record demonstrates that Defendant Phui was aware that Plaintiff was suffering various troubling

10  symptoms prior to that date, including chills, fever, pain, coughing up blood, and significant

11  weight loss, all of which constitutes "an injury that a reasonable doctor or patient would find

12  important and worthy of comment or treatment."  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th

13  Cir. 2014) (citation omitted).  Thus, the Court finds that Plaintiff has satisfied the objective prong

14  of the deliberate medical indifference analysis.

15                  **2.  Defendants Were Not Deliberately Indifferent**

16         Turning to the second prong, however, Plaintiff fails to establish a genuine dispute of

17  material fact as to whether either Defendant was deliberately indifferent to his serious medical

18  condition.  *Jett*, 439 F.3d at 1096.

19                        a.   Defendant Phui

20         The record is undisputed that Davis had 12 medical visits with Dr. Phui between

21  November 2018 and January 2019, when he was diagnosed with endocarditis.  (*See generally*

22  Doc. No. 93).  During those appointments, Dr. Phui ordered numerous tests to diagnose and

23  prescribed medication to address Plaintiff's symptoms.  Specifically, Dr. Phui ordered multiple

24  chest x-rays, a sputum culture, a thyroid function test, tests for Valley Fever, tuberculosis, HIV,

25  and pneumonia.  Dr. Phui prescribed multiple antibiotics (Bactrin, Fluconazole, Levaquin,

26  Ampicillin, Doxycycline) which were—to varying degrees—effective at alleviating some of

27  Davis's symptoms, as well as antifungals, an inhaler, and cough medicine.  Further, Dr. Phui

28  referred Davis to specialists in cardiothoracic surgery, infectious disease, pulmonology, urology,

18

1    and hematology/oncology.  (*Id.*).

2         The record reflects that Dr. Phui diligently took numerous measures to attempt to identify

3    the source of Davis's varying symptoms and provide appropriate treatment.  At no point did Dr.

4    Phui deny Davis treatment, dismiss his symptoms or concerns, or fail to act promptly on the

5    recommendations of specialists or other SATF medical staff; indeed, the undisputed record shows

6    that Dr. Phui ordered every test, prescription, and referral that was recommended by specialists

7    and Adventist Bakersfield Hospital physicians.  (Doc. No. 84-1 at 5 ¶ 14, 5-6 ¶ 17, 6-7 ¶¶ 21-22).

8    As soon as Davis presented with clear symptoms of endocarditis, Dr. Phui referred Davis for

9    transfer to an outside hospital on an emergency basis and Davis was transferred that day.  (*Id.* at 6

10   ¶ 19).

11        Defendants' medical expert, Dr. Lampiris, opines that Davis received appropriate medical

12   care by the team at SATF, and that the delay of 10 weeks in diagnosing Davis was "a not

13   uncommon delay in cases of enterococcal endocarditis."  (Doc. No. 84-6 at 4).  Lampiris notes

14   that Plaintiff was examined by an infectious disease specialist in early January 2019 and even the

15   specialist failed to diagnose endocarditis.  (*Id.* at 3-4).  Lampiris further opines that "it is common

16   for the correct diagnosis of enterococcal endocarditis to be delayed, because the symptoms are

17   very vague and often attributed to other more common causes.  (*Id.* at 3).

18        In his SAC, Plaintiff alleged that Dr. Phui disregarded his serious condition and dismissed

19   his symptoms as resulting from drug use.  (Doc. No. 54 at 7 ¶ 20).  This claim is refuted by the

20   undisputed record in this case, which reflects that, while Defendant Dr. Phui did refer Plaintiff to

21   a drug treatment program on more than one occasion—and that Plaintiff continued to use IV

22   drugs throughout the period in question—Dr. Phui provided extensive medical care for Plaintiff's

23   symptoms, as discussed in detail above, and considered numerous potential sources for Davis's

24   symptoms, including pneumonia, Valley Fever, and HIV.  (*See generally* Doc. No. 84-1).

25        In his Opposition to Defendants' MSJ, Plaintiff contends that Dr. Phui nonetheless should

26   have diagnosed him with endocarditis earlier, because his IV drug use, combined with the

27   presence of a heart murmur, are among the Duke Criteria for diagnosing endocarditis.  (Doc. No.

28   90 at 4 n. 1).  Notably, Plaintiff does not ask the court to take judicial notice of the Duke Criteria.

1   The Court takes judicial notice *sua sponte* of the fact that the Duke Criteria are a widely-

2   recognized clinical guide for diagnosing infective endocarditis.  *See* Fowler, Vance G et al. "The

3   2023 Duke-International Society for Cardiovascular Infectious Diseases Criteria for Infective

4   Endocarditis: Updating the Modified Duke Criteria." *Clinical infectious diseases : an official*

5   *publication of the Infectious Diseases Society of America* vol. 77,4 (2023): 518-526.

6   doi:10.1093/cid/ciad271; *see also Aguchak v. United States*, 2017 WL 5244174, at *4 (D. Alaska

7   Oct. 27, 2017), aff'd, 747 F. App'x 503 (9th Cir. 2018).[2]  Plaintiff's counsel points out that

8   clinical criteria for definite endocarditis requires two major criteria, or one major and three minor

9   criteria, or five minor criteria.  Clinical criteria for possible endocarditis requires at least one

10   major criterion and one minor criterion, or three minor criteria.  (Doc. No. 90 at 17).[3]

11        However, even accepting the relevance of the Duke Criteria, the CDC publication Plaintiff

12   provides in support of his argument specifies that only "new valvular regurgitation" constitutes a

13   major criterion for infective endocarditis and that "worsening or changing of preexisting murmur

14   [is] not sufficient." (Doc. No. 90 at 16).  It is uncontested and in fact admitted by Plaintiff that

15   his heart murmur existed since he was a child.  Further, there is no evidence in the record that it

16   worsened at any point between October 2018 and January 2019.  Thus, there is no evidence that

17   Plaintiff's murmur was a major criterion under the Duke Criteria.  (*See* Doc. No. 54 at 6 ¶ 14).

18   The facts only point to the presence of one minor criterion (Plaintiff's IV drug use), thus Plaintiff

19   fails to establish that he presented sufficient Duke Criteria that any reasonable physician would

20   have diagnosed or suspected endocarditis prior to January 30, 2019.  Nor does Plaintiff submit

21   any expert testimony to refute Defendants' expert witness's conclusion as to normal delay in

22   diagnosing endocarditis or that there was no deliberate indifference or reckless delay in

23

24   [2] Federal Rule of Evidence 201 permits a court to take judicial notice of facts that are "not subject to reasonable dispute" because they are either "generally known within the trial court's territorial

25   jurisdiction," or they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The Court may take judicial notice on its own or at the

26   request of any party.  *Id.* 201(c).

27   [3] *See also* Baddour, Larry M et al.  "Infective Endocarditis in Adults: Diagnosis, Antimicrobial Therapy, and Management of Complications: A Scientific Statement for Healthcare Professionals From the American Heart Association." *Circulation* vol. 132,15 (2015): 1435-86.

28   doi:10.1161/CIR.0000000000000296.

1   diagnosing Davis's endocarditis.  (Doc. No. 84-6 at 3-4).

2           At most Plaintiff presents a possible medical negligence claim under the theory that

3   Defendant Dr. Phui should have diagnosed Plaintiff with enterococcal endocarditis sooner.  But

4   medical negligence does not amount to cruel and unusual punishment under the Eighth

5   Amendment.  *See Broughton v. Cutter Labs*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam)

6   (medical malpractice or negligence does not support a cause of action under the Eighth

7   Amendment); *Garcia v. Katukota*, 362 F. App'x 622, 622 (9th Cir. 2010) (evidence of medical

8   misdiagnosis and difference of medical opinion are insufficient to show deliberate indifference).

9           Here, the overwhelming evidence of record demonstrates shows that Defendant Dr. Phui

10  provided regular and timely medical care for Davis's identified symptoms, diligently investigated

11  possible sources of Davis's condition, and recommended that Davis be seen by specialists without

12  undue delay to receive a higher level of care.  Taken together, the record refutes Plaintiff's claim

13  of medical deliberate indifference.  Defendant Phui is accordingly entitled to summary judgment

14  on this basis.

15                          b.   Defendant Dr. Ugwueze

16          Turning to Defendant Dr. Ugwueze, the undisputed facts reflect that at no time was he

17  directly involved in Davis's medical care.  Dr. Ugwueze's role was limited exclusively to

18  supervision of Dr. Phui and other CSATF medical staff.  (Doc. No. 84-3 ¶¶ 4, 6).  Plaintiff

19  contends that the failure to diagnose him sooner than 10 weeks is *ipso facto* evidence of inadequate

20  medical care, and thus raises a dispute of material fact as to whether Dr. Ugwueze observed deficient

21  medical care but failed to remedy it.  However, as discussed above, the undersigned finds that the

22  undisputed facts do not reflect deficient medical care by Defendant Dr. Phui that rises to the level of a

23  constitutional violation.  Thus, Dr. Ugwueze cannot be found liable for an Eighth Amendment

24  violation given that there was no underlying constitutional violation by his employee.  Accordingly, the

25  undersigned recommends the District Court grant Defendants' motion as to Dr. Ugwueze as well.

26      **E.  Qualified Immunity**

27          A government official is entitled to qualified immunity under Section 1983 unless (1) the

28  official "violated a federal statutory or constitutional right, and (2) the unlawfulness of his

                                                    21

1   conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 583 U.S. 48, 62-63

2   (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Harlow v. Fitzgerald*, 457 U.S.

3   800, 817 (1982).  To demonstrate that a right was "clearly established" requires a showing that

4   the statutory or constitutional question was "beyond debate," such that every reasonable official

5   would understand that what he is doing is unlawful.  *Wesby*, 583 U.S. at 63; *Vos v. City of*

6   *Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018).

7         This standard is "demanding" and protects "all but the plainly incompetent or those who

8   knowingly violate the law."  *Wesby*, 583 U.S. at 63 (citing *Malley v. Briggs*, 475 U.S. 335, 341

9   (1986)).  "[A] court typically should identify a case where an officer acting under similar

10   circumstances as [the defendant] was held to have violated the constitutional right at issue."  *S.B*

11   *v. County of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017)).  "Even when no case is 'directly

12   on point,' courts may compare relevant factors to determine whether every reasonable officer

13   should have known the conduct in question was unlawful."  *Anderson v. Virga*, 2018 WL

14   1556806, *2 (E.D. Cal. Mar. 30, 2018) (citing *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d

15   938, 946-47 (9th Cir. 2017).  The plaintiff bears the burden of establishing that the right alleged

16   was clearly established.  *Moran v. Washington*, 47 F.3d 839, 844 (9th Cir. 1998).

17         Here, Defendants assert they are entitled to qualified immunity because they did not

18   violate any particular infectious disease protocol and it was not clearly established that a doctor

19   violates the Eighth Amendment by failing to diagnose a disease that even specialists are unable to

20   detect.  (Doc. No. 84 at 19).  In response, Plaintiff cites general case law supporting Plaintiff's

21   right to adequate medical care, arguing that Defendants violated his clearly established right.

22   (*See* Doc. No. 90 at 5) (citing *Estelle*, 429 U.S. at 103-104).

23         However, the qualified immunity analysis requires examining the right being asserted "in

24   light of the specific context of the case, not as a broad general proposition."  *Carley v. Aranas*,

25   103 F.4th 653, 661 (9th Cir. 2024) (rejecting a plaintiff's assertion that she was entitled to the

26   latest Hepatitis C treatment based on general deliberate indifference case law, finding that

27   plaintiff's claim "defines the right too broadly"); *see also Hampton v. California*, 83 F.4th 754,

28   769 (9th Cir. 2023) ("it is not sufficient that *Farmer* clearly states the general rule that prison

1    officials cannot deliberately disregard a substantial risk of serious harm to an inmate.  To be

2    clearly established, the relevant right must have been defined more narrowly").  Here, Plaintiff

3    does not point to any specific case law establishing a constitutional right to have a primary care

4    physician or his supervisor detect an infectious disease within a particular time frame, when even

5    an infectious disease specialist was unable to diagnose the disease.  Accordingly, the Court finds

6    that Plaintiff fails to carry his burden to show that the right asserted was clearly established, and

7    that Defendants motion should be granted on the alternative grounds that they are entitled to

8    qualified immunity.

9                                **CONCLUSION**

10            Construing the evidence in the light most favorable to Plaintiff, the undersigned finds

11   there is no triable issue as to whether Defendants Dr. Phui and Dr. Ugwueze acted with deliberate

12   indifference to Plaintiff's serious medical condition.  The record demonstrates Plaintiff received

13   adequate medical care for his symptoms, and once diagnosed with infective endocarditis, he was

14   immediately transferred to an outside hospital where he received life-saving heart surgery.

15   Additionally, because Plaintiff's right to have his endocarditis detected at an earlier time was not

16   clearly established, the undersigned further recommends Defendants' motion be granted on the

17   grounds of qualified immunity.

18            Accordingly, it is **RECOMMENDED**:

19            The district court GRANT Defendants Dr. Phui and Dr. Ugwueze's motion for summary

20   judgment (Doc. No. 84), enter judgment in Defendants' favor, and close this case.

21                              **NOTICE TO PARTIES**

22            These Findings and Recommendations will be submitted to the United States District

23   Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

24   after being served with a copy of these Findings and Recommendations, a party may file written

25   objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

26   "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

27   **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

28   wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).


Dated:    December 12, 2024

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE